**AMERICAN COMPUTER TRUST LEASING, Plaintiff,**

v.

**JACK FARRELL IMPLEMENT CO., et al., Defendants.**

**AMERICAN COMPUTER TRUST LEASING, Plaintiff,**

v.

**BOERBOOM INTERNATIONAL, INC., et al., Defendants.**

Civ. Nos. 4–89–199, 4–89–261.

United States District Court, D. Minnesota, Fourth Division.

April 5, 1991.

Craig D. Diviney, J. Thomas Vitt, Margaret M. Zverinova and Dorsey & Whitney, Minneapolis, Minn., for plaintiff and Automatic Data Processing, Inc.

James R. Anderson, Marshall, Minn., for defendants Boerboom and Farrell.

John Q. McShane, Mary E. Bolcom, Lezlie Ott Marek and Bowman and Brooke, Minneapolis, Minn., for Navistar Intern. Transp. Corp.

Bradley G. Clary, and Oppenheimer, Wolff & Donnelly, St. Paul, Minn., Robert A. DuPuy, John F. Hovel, and Foley & Lardner, Milwaukee, Wis., for J.I. Case Co.

ORDER

DOTY, District Judge.

This matter is before the court on the following motions:

1. Plaintiff American Computer Trust Leasing and counterclaim defendant Automatic Data Processing, Inc.'s motion for summary judgment;

2. Counterclaim defendant Navistar International Corporation's motion for summary judgment;

3. Counterclaim defendant J.I. Case Co.'s motion for summary judgment; and

4. Defendants Jack Farrell Implement Co. and Boerboom International's motion to stay entry of any judgment against them.

Based on a file, record and proceedings herein, the motions for summary judgment are granted and defendants' motion to stay entry of judgment is denied.

BACKGROUND

Plaintiff American Computer Trust Leasing ("ACTL") brought suit against defendants Boerboom International, Inc. ("Boerboom") and Jack Farrell Implement Co. ("Farrell") (collectively referred to as the defendants) to collect payments for computer hardware leased from ACTL. Boerboom and Farrell each claim that their obligation should be excused because the hardware did not work properly. The defendants also bring various counterclaims against plaintiff ACTL and counterclaim defendants Automatic Data Processing, Inc. ("ADP"), Navistar International Transportation Corporation (formerly International Harvester) ("IH") and J.I. Case Company ("Case"). The counterclaims may be divided into three main groups. First, the defendants bring computer system claims alleging that they were defrauded in connection with their acquisition of ADP computer systems. They further allege that the computer systems performed poorly and assert claims for breach of contract and breach of express and implied warranties. The breach of contract and breach of express and implied warranty claims are

found in Counts I and II of the counterclaims while the fraud claim appears primarily in Count III. Second, the defendants bring various conspiracy claims. Boerboom and Farrell allege that IH, Case and ADP conspired to force the defendants to purchase ADP computer systems. The defendants assert claims based on civil conspiracy (Count III), violation of state and federal antitrust laws (Count IV) and violations of the Racketeer Influenced and Corrupt Organizations Act (Count IV). Finally, the defendants bring software deactivation claims alleging that their computer software was wrongfully deactivated, relying on various statutes. (Counts VI through XI). ADP brings separate claims against Farrell and Boerboom to collect payments due pursuant to their leases for computer services.

Farrell and Boerboom are presently Case agricultural equipment dealers and were IH dealers before the January 1985 sale of IH's farm equipment business to Case. Before 1983, IH furnished computer services directly to all of its farm implement dealers in exchange for a monthly fee. IH decided to outsource the dealer computer services because of the severe financial strain it experienced during the early 1980s as a result of the downturn in the U.S. farm economy.[1] IH made the decision in 1982 to stop providing such services to its dealers and began to look for an outside vendor to provide those services. IH discussed its plan with eleven system vendors. One of those companies was ADP. IH communicated to the potential vendors that if selected as a vendor a company would be required to develop a system of hardware and software capable of communication with IH's mainframe. IH also wanted vendors to develop software that would provide dealers with capabilities in the area of parts ordering, inventory tracking, accounting, customer record keeping, warranty records and whole goods ordering.

IH decided to endorse only one vendor, ADP, and ADP and IH entered into a contract on May 16, 1983. The contract required ADP to develop a communications

---

1. During 1982 alone, IH lost over $800,000,000.

software package called the Dealer Communications Systems ("DCS") which would enable IH and its dealers to communicate with each other through a dealers communications network ("DCN") and also permit dealers to communicate amongst themselves. ADP agreed to develop and provide suitable hardware for both on-line and on-site dealer computer needs. IH further required ADP to modify its existing dealer software products to specifically meet the needs of IH dealers. ADP also agreed to participate in a steering committee which monitored the transition to the ADP system.

IH endorsed only ADP for a number of reasons. ADP was a large stable company and one of the pioneers in the computer services industry.[2] Second, ADP agreed to tailor its computer products to meet the needs of IH and its dealers. Third, IH believed that endorsing only one vendor would facilitate a smoother transition to a new system for both IH and its dealers. Fourth, IH's strained financial condition mandated a quick termination of its computer services business and a single endorsement would help streamline that process.

Both the contracts between IH and ADP and between IH and its dealers expressly provide that vendors other than ADP could provide computer services to the dealers. Vendors who wanted to provide the DCN component of the computer services to IH dealers were required to submit to a testing process to ensure that the vendor met DCN specifications. The specifications were made available to vendors early in the conversion process and numerous other vendors developed DCN capability and competed with ADP for sales. Only the DCN component required such certification. Dealers could use any parts managements or accounting system without reference to compatibility with the IH communications center.

IH had a considerable investment in its computerized dealer communication network. It also incurred considerable expense in outsourcing the dealer computer services. It sought to recoup some of this expense in its contract with ADP. During negotiations IH initially sought a lump sum payment of $1,000,000 as consideration for its investment. ADP was reluctant to make such a payment because of IH's uncertain future and insisted on paying a royalty for each dealer sale as a method of defraying IH's costs and investment.[3] ADP therefore contracted to pay IH a royalty for each system sold in amounts varying from $500 to $4,250, with an average royalty of $1,700.[4]

Defendant Boerboom had served as an IH dealer since at least 1980. Boerboom agreed to purchase an ADP system on October 9, 1984. Stephen Boerboom, the general manager and vice president of Boerboom, considered the purchase of another type of computer system before choosing ADP. Boerboom also testified that before the purchase he knew that IH allowed other computer vendors to certify that they met DCN specifications. Boerboom attended an ADP–IH sponsored roll-out meeting on October 9, 1984.[5] Although Boerboom at that time was considering the purchase of a different computer system, the roll-out meeting and Boerboom's own investigation caused him to conclude that the ADP system was the equivalent of the other system it was considering. Shortly thereafter, on November 6, 1984, Boerboom entered into

---

**2.** In the early 1980s ADP was an industry leader in providing computer services to automotive dealerships.

**3.** ADP had a similar royalty arrangement with another agricultural equipment manufacturer, Allis–Chalmers.

**4.** Royalties like those included in the ADP–IH agreement are a common method of payment in the computer industry. Normally such royalties are used when the value of a business contract cannot be closely estimated at the time when the contract begins. The effect of such royalties is to protect both parties and to help ensure that the eventual total payment reasonably corresponds with the ultimate value of the contract.

**5.** Such meetings were conducted to give the dealers the opportunity to learn about IH's computer requirements and learn about the manner in which the dealers would be able to communicate with IH through ADP systems.

an equipment lease for an ADP Series 2000 Model 2020 computer system. IH received a $500 royalty payment as a result of Boerboom's purchase. Case received nothing.

Defendant Farrell had been an IH dealer since 1962. Farrell also attended the roll-out meeting sponsored by IH and ADP on October 9, 1984. On January 31, 1985, IH sold its agricultural equipment business to Case. Following a brief transition period which ended in late spring of 1985, IH had no further involvement with its former agricultural dealers, including Boerboom and Farrell, regarding any matters, including those relating to communication and computer services. On May 9, 1985, approximately three months after becoming a Case dealer, Farrell signed an ADP software license agreement and an ADP equipment purchase agreement. In August 1985, the purchase agreement was modified when Farrell signed an agreement to lease rather than buy the equipment. In that contract, Farrell leased a Series 2000 Model 2015 computer system. Steve Farrell, primary operating officer of Farrell, testified that Farrell looked at four or five vendors, narrowed its choice to either ADP or Farm Equipment Association and eventually chose an ADP system. Neither IH nor Case received a royalty payment as a result of this transaction.

The relationship between the defendants, and ADP and ACTL is governed by three contracts: the purchase and maintenance agreement and the software license agreement with ADP, and the equipment lease agreement with ACTL. Under the purchase and maintenance agreement and the software license agreement, Boerboom and Farrell each agreed to purchase computer hardware from ADP, to pay ADP a monthly fee for maintenance and support of the computer hardware and to license several software applications from ADP. Both Boerboom and Farrell decided to exercise their options to lease their computer hard-

ware from ACTL. Their decision to lease the computer hardware canceled that part of the purchase and maintenance agreements concerning the direct sale of the computer hardware but left the remaining provisions of the agreements in force. Boerboom and Farrell both entered into an equipment lease agreement with ACTL which provided for a seven-year term of monthly lease payments to ACTL. Neither IH nor Case is a party to the contracts between the defendants and ADP and ACTL.

After acquiring the IH assets, Case extended offers to both Farrell and Boerboom to become agricultural equipment dealers for Case. Farrell and Boerboom accepted their respective offers. Farrell and Case entered into an agricultural equipment dealer agreement effective March 12, 1985. Boerboom and Case entered into a similar contract effective February 20, 1985. Both Farrell and Boerboom continue today as Case dealers.

On January 7, 1985, shortly after Case announced that it (and its parent company Tenneco) would be purchasing certain assets of IH's agricultural equipment operations, Case notified all of its North American dealers that it had signed letters of intent to endorse two computer system suppliers, ADP and Dealer Information Systems. On January 7, 1985, before Farrell had signed any contracts with ADP, Case sent its dealers a letter stating that its endorsement meant that it judged that both the ADP and DIS systems would be effective for its equipment dealers use. The letter further stated that the endorsed suppliers were judged to be experienced and proven performers in the dealer system market and that the suppliers were obligated by contract with Case to meet Case's communications requirements. The letter also noted that Case required all of its dealers obtain some type of communication system by the end of 1986.[6] In ap-

---

6. Although Case began requiring its agricultural dealers to become part of the computerized dealer communication network after it purchased the agricultural division of IH in 1985, this was never an IH requirement. Boerboom nonetheless leased and installed an ADP system while it was still an IH dealer. Farrell leased and installed an ADP computer system approximately three months after it became a Case dealer but over eighteen months before Case's deadline.

proximately March 1985, Case announced that it approved three additional manufacturers, RIMSS, Dubuque Data Systems and NFPEGA, as vendors for dealer computer systems.

On May 6, 1985, Case and ADP entered into a contract concerning the development and implementation of a communications bridge between Case's host processing computer and the ADP dealer communication system that had been developed for the IH dealers. The agreement provided that the ADP computer system would be available to Case dealers in regional system selection meetings between May 6, 1985 and December 31, 1986. That agreement specifically noted that DIS, the other manufacturer endorsed by Case, would also be present at those roll-out meetings as a Case-endorsed vendor.[7] The Case–ADP contract further provided royalties for ADP systems purchased by Case dealers. Case, however, would not earn royalties for computer installations where the royalty had been paid or was due to be paid to IH pursuant to the ADP–IH agreement.[8]

Boerboom and Farrell defaulted on their obligations to ACTL under the equipment lease agreements and ACTL seeks judgment against them. The defendants bring a myriad of claims against ACTL, ADP, IH and Case. The defendants also move to stay entry of any judgment against them. ACTL, IH and Case seek summary judgment on all of defendants' counterclaims. ADP also moves for summary judgment on all of defendants' counterclaims except for their breach of express warranty claims.

## DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Stated in the negative, summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). A fact is material only when its resolution affects the outcome of the case. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. at 2552–53. With this standard at hand, the court will consider all of the motions.

I. *ACTL's Motion for Summary Judgment on Its Claims Against Defendants*

■ Plaintiff ACTL seeks summary judgment on its claims against Boerboom

---

7. Steve Farrell acknowledged that his dealership did not attend any roll-out meetings sponsored by Case and also declined various invitations by Case to obtain more information about the computer systems offered by the various vendors.

8. Pursuant to its ADP contract, Case to date has received royalty payments of $508.20. ADP paid that royalty as a result of the sale of an ADP computer system to one Case dealer, neither Farrell nor Boerboom.

and Farrell. Those claims are governed by the contracts between the parties: Boerboom's November 6, 1984 equipment lease agreement and Farrell's August 19, 1985 equipment lease agreement. The central provision of the agreements provides that:

> This agreement provides for a net lease and the rent and other amounts due hereunder from Lessee to Lessor shall not be subject to any defense, claim, reduction, set-off or adjustment for any reason whatsoever.

This section is a "hell or high water" clause common to equipment leasing agreements. *See, e.g., In re OPM Leasing Servs., Inc.,* 21 B.R. 993 (S.D.N.Y.1982). This clause obligates Boerboom and Farrell to make the payments required by the equipment lease agreements regardless of any defenses that they may raise. Boerboom and Farrell do not attack the validity of the equipment lease agreements and thus Boerboom and Farrell must pay ACTL the amounts owed pursuant to the lease agreements.[9] The court in *In re OPM Leasing Services* stated:

> [c]ourts have uniformly given force and effect to "hell and high water" clauses in the face of various kinds of defaults by the party seeking to enforce them (citations omitted). The courts ... held that clauses containing unconditional promises are strictly enforceable as a matter

of law. In doing so, they have found summary judgment in favor of the lessor or its assignee because no facts submitted or to be submitted by the lessee opposing summary judgment are in any way relevant to the lessee's unequivocal liability based on these hell and high water provisions.

21 B.R. at 1006–07.[10]

■■■ Under the terms of the equipment lease agreements, Boerboom and Farrell are liable to ACTL. Both have defaulted on the equipment lease agreements. The agreements give ACTL the right to repossess and sell the equipment and to recover damages.[11]

Boerboom and Farrell raise two defenses to ACTL's damages calculation: (1) they contend that they did not receive a stipulated loss value sheet; and (2) they argue that ACTL delayed in reselling the computer equipment, thus reducing the value that ACTL received on resale. Defendants' assertion that they did not receive the stipulated loss value sheet is irrelevant because it provides no defense to their liability for the breach of contract. ACTL concedes that defendants' second argument, that ACTL failed to mitigate its damages, raises a material fact issue and seeks judgment calculated by using the figure that defen-

---

9. ACTL and the defendants agree that Illinois law applies to the agreements. The hell or high water clause of the agreements is valid and enforceable under Illinois law. *See, e.g., Dillman & Assocs., Inc. v. Capitol Leasing Co.,* 110 Ill.App.3d 335, 66 Ill.Dec. 39, 442 N.E.2d 311 (1982) (holding that lessee was liable for all rent due under the terms of a lease with a hell or high water clause regardless of lessee's claim that the leased equipment was defective); *Walter E. Heller & Co. v. Convalescent Home of the First Church of Deliverance,* 49 Ill.App.3d 213, 8 Ill.Dec. 823, 365 N.E.2d 1285 (1977).

10. Other jurisdictions uniformly enforce lease agreements with hell or high water clauses. *See, e.g., Philadelphia Sav. Fund Soc'y v. Deseret Management Corp.,* 632 F.Supp. 129 (E.D.Pa. 1985); *St. Paul Leasing Co. v. Winkel's, Inc.,* 309 Minn. 583, 244 N.W.2d 661 (1976).

11. The defendants contend that the computer equipment did not work properly and thus they are not liable under the terms of the equipment lease. Given ACTL's limited role in the acquisition of the ADP computer system, Boerboom

and Farrell must look only to ADP, the supplier of the computer systems, for any claims that the equipment did not work properly. Those claims must be made under the warranty provisions of the purchase and maintenance agreements between ADP and the defendants. *See* U.C.C. § 2A–103 Official Comment which states:

> [d]ue to the limited function usually performed by the [finance] lessor, the lessee looks almost entirely to the supplier for representations, covenants and warranties.

Although this portion of the Uniform Commercial Code was not in effect in Illinois at the time the parties entered into their respective lease agreements, the hell or high water clause of the equipment lease agreements reflects the realities of ACTL's role in the lease transaction. ACTL spent its funds to purchase the particular computer hardware selected by Boerboom and Farrell selected and ACTL furnished that hardware to them. In return, Boerboom and Farrell unconditionally obligated themselves to pay ACTL a stream of lease payments.

dants claim represents the fair market value of the computers at the time of ACTL's repossession.[12] Based on the foregoing, ACTL's motion for summary judgment against Boerboom and Farrell is granted in the amounts of $20,855.42 against Boerboom and $33,020.46 against Farrell.

## II. *ACTL's Motion for Summary Judgment on Defendants' Counterclaims*

ACTL is named as party in Counts III through XI of the defendants' counterclaims. Each of the counterclaims will be examined in turn to determine if summary judgment is appropriate. The counterclaims may be divided into three main areas. First there are computer system claims in which the defendants allege that they were defrauded in their acquisition of ADP computer systems. The fraud claim appears to be centered in Count III of the counterclaims. They also allege that the computer systems performed poorly and assert claims for breach of contract and breach of express and implied warranties, found in Counts I and II of the counterclaims. Second, the defendants bring various conspiracy claims. Boerboom and Farrell allege that IH, Case, ACTL and ADP conspired to force them to purchase ADP computer systems. Boerboom and Farrell assert claims based on civil conspiracy (Count III), violation of state and federal antitrust law (Count IV) and violation of the Racketeer Influenced and Corrupt Organizations Act (Count V). Finally, Boerboom and Farrell bring software deactivation claims asserting that their computer software was wrongfully deactivated and bringing claims based on various statutes (Counts VI through XI). ACTL now seeks summary judgment on all of Boerboom and Farrell's counterclaims.

### A. Defendants' Fraud Claims

A fraud claim must involve a false statement of a past or present material fact. *Dollar Travel Agency, Inc. v. Northwest Airlines,* 354 N.W.2d 880 (Minn. Ct.App.1984). Boerboom and Farrell proffer no evidence that ACTL made any false statements to them, and thus ACTL is entitled to summary judgment on their fraud claims.

### B. Conspiracy and Software Deactivation Claims

The defendants main allegation concerning ACTL is that ACTL is owned primarily by ADP and thus ACTL must be involved in the fraud, conspiracy and software deactivation allegations they make against ADP, IH and Case. However, the defendants do not offer any evidence that ACTL made any fraudulent statements to them, deactivated their software or otherwise had anything to do with those allegations. ACTL offers evidence to rebut defendants' allegations concerning its involvement. James Sproule, Director of Credit and Operations for ADP, testified that ACTL's only involvement with Boerboom and Farrell involved the financing of their acquisition of ADP computer systems and administering their lease agreements. Boerboom and Farrell offer no evidence to dispute this and thus summary judgment is granted in favor of ACTL on all of defendants' counterclaims.[13]

## III. *ADP's Motion for Summary Judgment on Defendants' Claims*

ADP also seeks summary judgment on all of defendants' counterclaims except for the breach of express warranty claims.

12. ACTL originally sought a judgment against Boerboom for $26,895.42 and against Farrell for $38,040.46. The defendants, however, claim that ACTL did not mitigate its damages because it failed to promptly dispose of the repossessed equipment. ACTL, conceding that this claim raises a material fact issue, is willing to stipulate for purposes of this summary judgment motion to the fair market value of the computer systems at the date of the defaults, which defendants claim is $18,000. The amounts now requested reflect ACTL's substitution of the $18,-

000 for the amounts that ACT actually received when it resold the computer' systems.

13. Boerboom offers another defense to its liability: that ACTL terminated its lease on February 15, 1988 and thus is not entitled to lease payments after that date. The equipment lease agreement, however, expressly gives ACTL the right to terminate the lease on Boerboom's default and recover all the damages due pursuant to the lease terms.

**A. ADP's Motion for Summary Judgment on Defendants' Fraud Claims**

Defendants rest their counterclaims for fraud on two separate bases. First, the defendants claim that it was fraudulent for ADP, IH and Case to fail to disclose the arrangement for royalty payments. Defendants' second allegation of fraud arises from statements by ADP, Case and IH which allegedly induced the defendants to purchase computer systems which defendants contend failed to function as promised.

 To prevail on a claim of fraud, a party must prove that it relied on a false representation (or a failure to disclose a material fact which the other party had a duty to disclose) and the party was damaged as a result of the reliance. *Veit v. Anderson*, 428 N.W.2d 429, 433 (Minn.Ct. App.1988). The representation must be false and made with knowledge of its falsity, or held out as true although made without knowledge of its truth or falsity. *Id.* Moreover, the party making the representation must intend that the other party rely on it, the statement must be material and must concern a past or present fact rather than a promise of future performance. *Id.*

 Boerboom and Farrell first claim that ADP is guilty of fraud because it failed to disclose the existence of royalty payments to its clients. Nondisclosure, however, does not constitute fraud unless one party is "under a legal or equitable obligation to communicate to the other." *Daher v. G.D. Searle & Co.*, 695 F.Supp. 436, 440 (D.Minn.1988) (quoting *Richfield Bank & Trust Co. v. Sjogren*, 309 Minn. 362, 365, 244 N.W.2d 648, 650 (1976)). The obligation to disclose arises in two situations: (1) where one party owes a fiduciary duty to the other, *see Minnesota Timber Producers Ass'n, Inc. v. American Mutual Ins. Co.*, 766 F.2d 1261, 1267–68 (8th Cir.1985); or (2) where the circumstances are such that failure to disclose renders misleading statements which have already been made. *Estate of Jones v. Kvamme*, 430 N.W.2d 188, 193 (Minn.Ct.App.1988) (citations omitted), *rev'd in part on other grounds*, 449 N.W.2d 428 (Minn.1989).

Neither situation applies to the relationship between ADP and Boerboom and Farrell. ADP is not a fiduciary of the dealers because ADP, Boerboom and Farrell are business entities who bargained at arm's length in a commercial setting. *See, e.g., Minnesota Timber Producers*, 766 F.2d at 1268 (finding that no fiduciary relationship existed between two parties who merely contracted at arm's length); *W.K.T. Distrib. Co. v. Sharp Elec. Corp.*, 746 F.2d 1333, 1336–37 (8th Cir.1984) (applying Minnesota law to hold that an ordinary supplier-distributor relationship does not lead to a confidential relationship); *Groseth Int'l, Inc. v. Tenneco, Inc.*, 410 N.W.2d 159, 168–69 (S.D.1987) (upholding summary judgment that no fiduciary relationship existed between International Harvester and one of its dealers). ADP owes no fiduciary duty to the defendants. The defendants also proffer no evidence to demonstrate that ADP's alleged failure to disclose the royalty arrangements rendered misleading other statements which had already been made. Thus, ADP had no duty to disclose the royalty arrangement it reached with either IH or Case.

Defendants also assert a fraud claim based on the alleged concealment of material information concerning the royalty arrangements. Both Boerboom and Farrell testified that they were unaware of the royalty payment arrangement between ADP and IH and ADP and Case. The defendants present no other evidence to support their claim that the royalty payment arrangements were intentionally concealed. ADP, however, proffers evidence that it did disclose the royalty payments through the testimony of Gordon Gibbs, a nonparty fact witness. Gibbs attended a national IH dealer council meeting in February 1984, well before either Boerboom or Farrell leased from ADP. During that meeting, attended by various dealers and representatives of ADP and IH, the royalty payments were discussed. Gibbs testified specifically that ADP and/or IH disclosed to all members of the dealer council that ADP would make a royalty payment in the average amount of $2,000 directly to IH for

each ADP system sold to an IH dealer. Gibbs further testified that he told other dealers about the royalty payments and that any dealer could have learned about what was discussed at the dealer council meeting by calling the dealer representative. Thus, defendants' allegations of fraudulent concealment are unsupported by the facts and ADP's motion for summary judgment on this claim is granted.

 Defendants further claim that ADP made a myriad of allegedly fraudulent statements. In order for such representations to be actionable, they must be false statements of a past or present fact. *Iten Leasing Co. v. Burroughs Corp.*, 684 F.2d 573, 575 (8th Cir.1982) (applying Minnesota law). A wide variety of statements ordinarily used in sales negotiations are not actionable as fraud. These include ordinary sales puffing, *Hollerman v. F.H. Peavey & Co.*, 269 Minn. 221, 228–29, 130 N.W.2d 534, 540 (1964), statements of opinion, *Mutsch v. Rigi*, 430 N.W.2d 201, 204 (Minn.Ct.App.1988) (citation omitted), and promises of future performance, *Iten Leasing Co.*, 684 F.2d at 575. Moreover, any representation or expectation of future acts is not sufficient to support a fraud claim merely because the represented act or event does not occur. *RJM Sales & Mktg. v. Banfi Prods. Corp.*, 546 F.Supp. 1368, 1377 (D.Minn.1982) (applying Minnesota law).

 Defendants seek to impose liability on the basis of these types of statements, including:

"ADP is a proven dealer in data processing."

"[T]his Harvester/Case/ADP relationship will give us (Harvester/Case) leadership."

"The Harvester/Case/ADP relationship will ensure support."

"No other system compares to ADP."

"ADP is capable of dramatically increasing the efficiency and profitability within our dealership."

None of the alleged misrepresentations is actionable because each statement is either true, constitutes ordinary sales talk or puffing, or is a representation of future acts.[14] Defendants also list a number of statements of opinion as a basis for fraud. For example, the defendants offer a statement that "the competing challenger system does not have a chance of surviving." Statements of opinion are also not actionable. *Mutsch*, 430 N.W.2d at 204. Because Boerboom and Farrell proffered no evidence of any actionable statements, summary judgment is granted in favor of ADP on the defendants' fraudulent misrepresentation counterclaims.

B. ADP's Motion for Summary Judgment on Defendants' Claims of Breach of Contract and Breach of Warranty

1. *ADP's Motion for Summary Judgment on the Breach of Implied Warranty Claims*

 The purchase and maintenance agreements govern Boerboom and Farrell's claims for breach of warranty and contract. Article 10 of both agreements defines ADP's warranties as:

A. ADP represents and warrants to Client that, except as provided in paragraph 3 above, the Equipment shall be free and clear of all liens, claims, encumbrances and security interests whatsoever and that the Equipment shall be free from defects and material and workmanship at the Installation Date thereof.

B. EXCEPT AS SPECIFICALLY PROVIDED HEREIN, THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIM-

---

14. Even if ADP were wrong regarding some of the capabilities of its systems, this type of mistake is not actionable because "[a] good faith, non-negligent mistake is not the basis of liability for misrepresentation in this state." *Florenzano v. Olson*, 387 N.W.2d 168, 173 (Minn.1986). Moreover, defendants make no claim that ADP did not intend to perform at the time when such statements were allegedly made. Absent that intention, ADP is not liable for any statements about future expected benefits which did not occur. *Kramer v. Burns*, 396 N.W.2d 627, 631 (Minn.Ct.App.1986) (holding that an indication of an intent to act in the future is not actionable).

ITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

Under Minnesota law an exclusion of an implied warranty of merchantability is effective if it mentions merchantability and if in writing, the writing must also be conspicuous. Minn.Stat. § 336.2-316. An exclusion of the implied warranty of fitness is effective if it is in writing and is conspicuous. The Minnesota Commercial Code defines the term "conspicuous" as follows:

"Conspicuous:" A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed [sic] heading in capitals (as: NONNEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color. ... Whether a term or clause is "conspicuous" or not is for decision by the court.

Minn.Stat. § 336.1-201(10); see Dubbe v. A.O. Smith Harvestore Prods., Inc., 399 N.W.2d 644 (Minn.Ct.App.1987) (holding that claims for breach of implied warranty are particularly well suited for summary judgment because the court determines whether or not an exclusion of warranties is conspicuous).

■ The signature lines for the client in the purchase and maintenance agreements are in the lower right-hand corner on the front page of the agreements. Immediately above the place where Boerboom and Farrell signed is the following statement printed in bold:

THIS AGREEMENT IS SUBJECT TO ADDITIONAL TERMS AND CONDITIONS ON THE REVERSE SIDE WHICH CLIENT ACKNOWLEDGES HAVE BEEN READ AND ARE PART OF THIS AGREEMENT.

This exclusion term itself is printed in all capital letters while the surrounding terms are almost entirely in regular type. The language directed Boerboom and Farrell to examine the back of the contract where the exclusion provision is printed in contrasting type. Both Boerboom and Farrell admit that they had the opportunity to read the contract. Moreover, Boerboom and Farrell do not contest ADP's arguments concerning the exclusion of implied warranties. Based on the foregoing, the exclusion is conspicuous as a matter of law and ADP's motion for summary judgment on the implied warranty claims is granted.[15]

2. *ADP's Motion for Partial Summary Judgment on the Measure of Damages for Defendants' Breach of Express Warranty and Breach of Contract Claims*

■ The Minnesota Commercial Code provides for the recovery using two measures of damages for breach of warranty: direct damages and consequential damages. Minn.Stat. § 336.2-714. Direct damages are defined as "the difference at the time and place of acceptance between the value of goods accepted and the value they would have had if they had been as warranted." *Id*; see also *Kleven v. Geigy Agric. Chems.*, 303 Minn. 320, 323, 227 N.W.2d 566, 569 (1975). The Minnesota Supreme Court has defined consequential damages as:

Those that 'do not arise directly according to the usual course of things from the breach of the contract itself, but are rather those which are the consequence of special circumstances known to or reasonably supposed to have been contemplated by the parties when the contract was made.'

*Id.* at 324, 227 N.W.2d at 569 (citation omitted); see also Minn.Stat. § 336.2-715.

The purchase and maintenance agreements limit Boerboom and Farrell to direct damages for their breach of warranty claims. Article 11 of the Agreements provides:

B. IN NO EVENT WILL ADP BE RESPONSIBLE FOR SPECIAL, INDIRECT, INCIDENTAL OR CONSE-

---

**15.** Boerboom and Farrell argue that ADP's contract might not be effective because the person who signed the contracts for ADP, Mr. Suberlak, might not have been an authorized officer of ADP. However, defendants proffer no evidence to support this argument.

QUENTIAL DAMAGES WHICH CLIENT MAY INCUR OR EXPERIENCE ON ACCOUNT OF ENTERING INTO OR RELYING ON THIS AGREEMENT, EVEN IF A ADP HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Under Minnesota law the exclusion of consequential damages is valid unless such exclusion is unconscionable. Minn.Stat. § 336.2–719(3). The question of unconscionability is for the court. *See* Minn.Stat. § 336.2–302, U.C.C. Comment 3. In the present case, the exclusion allocates the risk of consequential damages in advance in a commercial setting and operates against two experienced businesses.[16] Under these circumstances the exclusion of consequential damages is not unconscionable and thus valid as a matter of law. *See, e.g., Kleven,* 303 Minn. at 329, 227 N.W.2d at 572. Therefore, ADP's motion for partial summary judgment limiting Boerboom and Farrell to the recovery of direct damages on their breach of express warranty claims is granted.[17]

C. ADP's Motion for Summary Judgment on Defendants' Conspiracy Claims

1. *ADP's Motion for Summary Judgment on Defendants' Civil Conspiracy Claims*

Conspiracy is defined as a combination of persons to accomplish either an unlawful purpose or a lawful purpose by unlawful means. *Harding v. Ohio Casualty Ins. Co.,* 230 Minn. 327, 337, 41 N.W.2d 818, 824 (1950) (citation omitted). To prove a civil conspiracy claim, a wrongful act must be done to the injured party.

The mere existence of a combination of persons acting in concert is insufficient to establish civil conspiracy. *Id.* If there is no underlying wrong there can be no civil conspiracy. *Id.* A civil conspiracy claim thus is merely a means for asserting vicarious or joint and several liability. *Id.* at 338, 41 N.W.2d at 825.

The defendants' civil conspiracy claim is found in Count III of the counterclaims. They assert the following as the wrongful acts committed by the conspiracy: (1) IH's endorsement of ADP; (2) fraud in the computer sales; (3) the defective nature of the computers; (4) the alleged deactivation of software and misappropriation of information; (5) witness tampering with Gordon Gibbs; and (6) threats made to Farrell by a collection agency. The vast majority of these allegations concern only ADP and do not implicate the other parties in the case. Thus, even if all of the claims were valid, the defendants' allegations fail to support their claims of civil conspiracy because they provide no evidence that any other party agreed with ADP or conspired with ADP to commit the alleged wrongful acts.[18] Defendants also seem to allege that IH, Case and ADP all made misrepresentations to them concerning the defendants' leasing of the ADP computer systems. They also offer no evidence of any conspiracy regarding the misrepresentations and thus these allegations constitute ordinary fraud claims at most.

Finally, the defendants allege as a basis for civil conspiracy violations of Minn.Stat. §§ 609.52, 609.88 and 609.89, which concern the wrongful taking of property, computer theft and computer damage.

16. Boerboom has been a farm implement dealer for 10 years and had gross sales of almost $5,000,000 in 1988. Farrell has been a farm implement dealer since 1962 and had almost $3,000,000 of sales in 1988.

17. The purchase and maintenance agreements also contain a provision limiting Boerboom's and Farrell's remedy to the repair and replacement of defective items of equipment. If enforceable, this provision would eliminate any claims for money damages for breach of express warranty. ADP concedes that at this point in the litigation there is a fact question concern-

ing whether or not that provision failed of its essential purpose. *See* Minn.Stat. § 336.2–719(2); *Jacobs v. Rosemount Dodge,* 310 N.W.2d 71 (Minn.1981). Therefore, this issue need not be addressed at this time.

18. Moreover, ADP hotly disputes the defendants' underlying fraud, breach of warranty and software deactivation claims. ADP also considers defendants' allegations of witness tampering to be unfounded. It further denies that it authorized, knew of or took part in any threats made to Farrell by a collection agency.

These claims also fail because Boerboom and Farrell proffer no evidence that their systems were damaged or that any information was taken. In addition, they provide no evidence that if such acts occurred, that ADP acted intentionally or with an intent to injure, as required for such violations.

Based on the foregoing, ADP's motion for summary judgment on the defendants' civil conspiracy claims is granted.

### 2. ADP's Motion for Summary Judgment on the Antitrust Conspiracy Claims

The defendants accuse ADP, IH and Case of conspiracy and restraint of trade in violation of Minn.Stat. § 325D.51 and § 1 of the Sherman Act, 15 U.S.C. § 1. Specifically, they claim that ADP, IH and Case conspired to force them to buy ADP computer systems. They contend that their status as farm implement dealers would have been jeopardized if they had refused to buy ADP systems. The defendants essentially allege that this conspiracy is a tying arrangement in violation of the state and federal antitrust laws.[19]

Courts define a tying relationship as the sale of one item (the tying product) on the condition that the buyer must also purchase a second item (the tied product) from the same source. *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518–519, 2 L.Ed.2d 545 (1958); *Rosebrough Monument Co. v. Memorial Park Cemetery Ass'n*, 666 F.2d 1130, 1140 (8th Cir.1981). The elements of an illegal tying arrangement are: (1) separate and distinct tying and tied products; (2) the seller will only sell the tying product on the condition that the buyer purchases the tied product; (3) the seller has market power in the market for the tying product; (4) the tying arrangements has foreclosed a substantial volume of commerce in the market for the tied product; (5) the seller has an economic interest in the market for the tied product; (6) the seller's activities affected interstate commerce; and (7) plaintiff was injured in its business or property because of the tying arrangement. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984).

The essence of a tying claim is the seller's use of its control over the tying product market to force the buyer to purchase the tied product. The United States Supreme Court stated:

> Our cases have concluded that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.

*Jefferson Parish Hosp.*, 466 U.S. at 12, 104 S.Ct. at 1558.

Boerboom and Farrell's only evidence of the alleged coercion is included in their affidavits which state that ADP was endorsed by IH and later by Case, and that Case told them they must have in-house computer systems capable of communicating with Case. Steve Boerboom admitted that he was never told that a refusal to purchase an ADP system would affect his status as an IH dealer; rather he testified that he merely assumed that fact but could not provide any basis for his assumption. Boerboom also knew that IH allowed other computer vendors to test for compatibility with its system. Moreover, he also testified that he considered the purchase of another type of computer system before choosing ADP. Farrell also concedes that his company could have purchased either an ADP system, a DIS system or a system manufactured by any of the three other vendors recommended by Case. Thus, the defendants proffer no evidence to support

---

**19.** The defendants' counterclaim also mentions refusal to deal, price fixing, production control and allocation of markets as bases for the antitrust claims. However, the defendants have never offered any facts to support those claims and thus summary judgment is granted in favor of ACTL, ADP, IH and Case on any claims premised on those legal bases.

their claims that they were forced to purchase ADP systems to remain either IH or a Case dealers and ADP is entitled to summary judgment on the federal antitrust claim.[20]

■ Minnesota courts consistently follow federal law in interpreting the Minnesota antitrust statutes. *State v. Duluth Bd. of Trade*, 107 Minn. 506, 517, 121 N.W. 395, 399 (1909); *Keating v. Phillip Morris, Inc.*, 417 N.W.2d 132, 136 (Minn.Ct.App. 1987) (citations omitted). Thus, the foregoing analysis applies to the defendants' state antitrust claims and summary judgment is granted to ADP on the state antitrust tying claim.[21]

### 3. *ADP's Motion for Summary Judgment on Defendants' RICO Conspiracy Claims*

Boerboom and Farrell allege in Count V of their counterclaims that ADP violated three sections of RICO, 18 U.S.C. §§ 1962(a), (c) & (d).[22] The elements of a RICO claim are: (1) conduct (2) of an enterprise engaged in or affecting interstate commerce (3) through a pattern (4) of racketeering activity (5) that causes injury to the business or property of the plaintiff.

18 U.S.C. §§ 1962, 1964(c); *see Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985).

To prove a civil RICO claim, a party must prove acts of racketeering activity as defined by § 1961(1). Section 1961(1) defines racketeering activity as certain specifically enumerated state felonies and violations of specific sections of the United States Criminal Code. 18 U.S.C. § 1961(1). Boerboom and Farrell allege the following acts of racketeering activity: (1) mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343) in connection with representations allegedly made to Boerboom and Farrell about their computer systems; (2) IH's contract with ADP and specifically ADP's payment of royalties to IH; and (3) the alleged deactivation of software which Boerboom and Farrell claim violates Minn. Stat. §§ 609.27, 609.275 and 18 U.S.C. §§ 875, 1951.[23]

■ To prove a mail fraud claim, defendants must prove a scheme to defraud, use of mails in furtherance of that scheme and a specific intent to defraud. *Schreiber Distrib. Co. v. Serv–Well Furniture Co.*, 806 F.2d 1393, 1399–1400 (9th

---

**20.** IH never required that its dealers purchase computer systems. When Case purchased the agricultural division of IH in 1985, Case began requiring its agricultural dealers to become part of its computerized dealer communication network. Case required its dealers to purchase computer systems prior to year-end 1986. Farrell decided to lease on ADP computer system eighteen months before this deadline. Boerboom actually acquired its ADP system before Case purchased the assets of IH.

The actual sales of ADP equipment also undercuts defendants' contention that they were forced to purchase ADP systems. Between the initial offering of the ADP system to dealers and the sale of the agricultural division to Case, only 74 IH dealers agreed to purchase the ADP system. After Case purchased IH's farm equipment business, an additional 174 dealers purchased the ADP system. Thus, only 250 dealers out of approximately 1,110 dealers eventually purchased the ADP system.

**21.** Moreover, Boerboom's antitrust claim is barred by the statute of limitations. The appropriate statute of limitations for both federal and state antitrust claims is four years. 15 U.S.C. § 15(b); Minn.Stat. § 325D.64. Boerboom en-

tered into its agreement to purchase an ADP computer system on October 9, 1984 and did not begin its antitrust action until February 3, 1989, more than four years after the accrual of any antitrust cause of action.

**22.** Section 1962(a) makes it unlawful for a person who has received income derived from a pattern of racketeering activity to invest any of that income in an enterprise. Section 1962(c) makes it unlawful to conduct the affairs of an enterprise through a pattern of racketeering activity. Section 1962(d) makes it unlawful to conspire to violate §§ 1962(a) or (c).

**23.** Boerboom and Farrell originally alleged racketeering activity based on the failure of the computer systems to work properly and also witness tampering with Gordon Gibbs in violation of 18 U.S.C. § 201. They subsequently abandoned those claims. Moreover, Gibbs himself testified that no witness tampering took place. During his deposition he was asked "did anybody from ADP ever attempt to threaten or coerce you in any way with respect to any testimony you've been asked to give? Answer: No." Thus, there is also no evidence before the court to support the defendants' witness tampering claim.

Cir.1986) (citations omitted). The elements of wire fraud substitute interstate use of wire communications for use of the mails but are otherwise identical. *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). As discussed above, Boerboom and Farrell present no evidence of actionable fraud and thus allegations of racketeering activity based on wire or mail fraud fail.

█ Case and IH's endorsements of ADP and ADP's payment of royalties to them are not racketeering activities as defined by Section 1961(1). Thus, this allegation also does not support defendants' RICO claim.

█ The software deactivation claims similarly do not support RICO claims.[24] Examining Boerboom's deactivation claims, the defendants do not contest ADP's assertion that Boerboom's computer system was never deactivated. Boerboom, after deciding to buy a computer system from a competitor of ADP, sent ADP a letter terminating its agreement effective August 31, 1987. Upon receiving this cancellation notification, ADP agreed to stop billing Boerboom for hardware maintenance, software licenses and software support. Despite Boerboom's cancellation notification, Boerboom subsequently alleged that its computer system was shut off wrongfully because ADP failed to provide it with a conversion tape to help transfer its information from ADP's computer system to another computer vendor's computer system. ADP admits that it did not provide a conversion tape but it had no obligation to do so because it never contracted to provide such tapes to help its former clients transfer information to new computer systems.

█ It is undisputed that ADP did deactivate Farrell's software.[25] The deactivation occurred, however, as a result of Farrell's nonpayment under the terms of the software license agreement. Both Boerboom and Farrell signed agreements providing that the licenses granted by ADP for software could be canceled upon the client's default. Moreover, the software license agreements expressly provided that ADP retain full ownership of the software used by Boerboom and Farrell. Both Boerboom and Farrell stopped paying the software license fees due under the software license agreements. Steven Farrell testified that Farrell was aware of the fact that software services would be discontinued if payments were not made. After Farrell's account had fallen significantly past due, ADP notified Farrell on June 30, 1987 that it would terminate all processing and support services on July 8, 1987 if payment was not received by that date. On July 8, 1987, ADP deactivated Farrell's software as previously warned. After Farrell discovered that its software had been shut off for nonpayment, Farrell paid the amounts past due on its account and ADP promptly reactivated the software.[26] At that point, ADP contends that Farrell disconnected its modem so that ADP could no longer access the system for service and support. Farrell made no further payments to ADP although ADP contends that Farrell continued to use ADP software and hardware.

█ The software deactivation claims do not support a RICO violation because the federal and state extortion statutes cited by the defendants do not apply to those claims based on the foregoing facts. The defendants assert that the software deactivation constitutes "ex-

---

**24.** The defendants also base a RICO claim on 18 U.S.C. § 641. Section 641 deals with embezzling, stealing, purloining or knowingly converting property of the United States. If the property involved in a dispute does not belong to the United States then no violation of § 641 is possible. *See United States v. Yokum*, 417 F.2d 253, 255 (4th Cir.1969) (citation omitted). The defendants' claims do not involve any property of the United States, and thus IH's, ADP's and Case's motion for summary judgment on the § 641 claim is granted.

**25.** Farrell further complains that ADP did not provide a conversion tape, but as discussed above, ADP had no contractual obligation to provide Farrell with such a tape.

**26.** Farrell disputes this, contending that its computer system was never reactivated. Because ADP had a legal right to deactivate the equipment this fact dispute is irrelevant for purposes of the summary judgment motion.

tortion" in violation of Minn.Stat. §§ 609.-27, 609.275 and 18 U.S.C. §§ 875, 1951. Violation of 18 U.S.C. § 875 is not a racketeering activity listed under § 1961(1) and thus cannot support the RICO claims. As discussed above, ADP suspended the defendants' use of its software because Boerboom requested deactivation when it changed to another type of computer system and because Farrell stopped paying ADP the license fees due under its software license agreement. ADP had a legal right to deactivate the defendants' software pursuant to the contracts and the extortion statutes do not apply. The federal statute defines extortion as the "obtaining of property from another, without his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). The Minnesota statute similarly requires "unlawful" activities. Minn. Stat. § 609.27. Because ADP's deactivation was not unlawful or wrongful but merely an exercise of its rights under the software license agreement, its deactivation does not violate either extortion statute and thus is not a racketeering activity.

Based on the foregoing analysis, all of defendants' racketeering allegations fail because none of them are premised on the requisite racketeering activity as defined by 18 U.S.C. § 1961(1) and ADP's motion for summary judgment on the RICO claims is granted.

### D. ADP's Motion for Summary Judgment on the Software Deactivation Claims

The defendants also bring a variety of claims in addition to the RICO claim on the basis of the alleged deactivation. Because Boerboom's software was never deactivated, *see* discussion above, ADP's motion for summary judgment on Boerboom's deactivation claims is granted.[27]

ADP also had a legal right to deactivate Farrell's software for nonpayment. Moreover, ADP was under no obligation to provide the defendants with a conversion tape and any claims based on ADP's failure to provide such a tape are unfounded.

In Count VI Farrell seeks treble damages pursuant to Minn.Stat. § 332.51 for ADP's alleged violations of Minn.Stat. §§ 609.52, 609.88 and 609.89. Civil recovery for violation of those statutes was not available until 1988 when Minnesota enacted § 332.51, the statute on which defendants seek to rely. Although § 332.51 does provide for civil liability for violations of those statutes, it was not approved until April 12, 1988, after the alleged deactivation occurred and has no bearing on this litigation.[28]

In Count VIII, Farrell seeks damages pursuant to Minn.Stat. § 548.05 for trespass, claiming trespass occurred when ADP wrongfully entered Farrell's computer system and also appropriated and destroyed Farrell's accounting and inventory records. The Minnesota statute provides for damages for trespass as follows:

> Whoever shall carry away, use or destroy any wood, timber, lumber, hay, grass, or other personal property of another person, without lawful authority, shall be liable to the owner thereof for treble the amount of damages assessed therefor in the action to recover such damages.

Minn.Stat. § 548.05. Minnesota courts hold that property must be "produced by and grown upon land" to come within the terms of this statute. *Mondt v. Sexter Realty Co.*, 293 N.W.2d 376, 377 (Minn. 1980). The *Mondt* court further held that home furnishings, toys and clothing do not constitute such personal property. *Id.* Moreover, the term "or other personal property" has been confined to property similar to property previously enumerated

---

**27.** Boerboom did not dispute ADP's assertion that its computer system was not deactivated.

**28.** There is no indication that Minn.Stat. § 332.51 is to be applied retroactively. Acts of the legislature are not retroactive unless expressly declared so by the legislature or unless it

appears that retroactivity was clearly and manifestly intended by the legislature. *Hunt v. Nevada State Bank*, 285 Minn. 77, 92, 172 N.W.2d 292, 302 (1969) (relying on Minn.Stat. § 645.21). Neither is true with respect to this statute.

in the statute, limiting trespass to things which are the product of the soil. *Berg v. Baldwin,* 31 Minn. 541, 542–43, 18 N.W. 821, 822 (1884). The alleged deactivation is not the taking of the type of property governed by this statute and thus ADP's motion for summary judgment on that claim is granted.

■■■ In Count IX, Farrell claims that ADP/ACTL and/or Harvester/Case made "wrongful entry into Farrell's property and by use of direct force appropriated and destroyed its accounting and/or inventory and/or accounting records." Farrell contends that those actions obstructed its free use of its property and thus constitutes statutory nuisance in violation of Minn. Stat. § 561.01. The Minnesota nuisance statute provides that:

> Anything which is injurious to health, or indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, is a nuisance.

Minn.Stat. § 561.01. Private nuisance has been defined as:

> an interference with the use and enjoyment of land. The ownership or rightful possession of land necessarily involves the right not only to unimpaired condition of the property itself, but also to some reasonable comfort and convenience in its occupation.

W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 87, at 619 (5th ed. 1984). There can be no nuisance if a party cannot show an injury stemming from an interest in land. The alleged deactivation, even if it occurred as defendants contend, is not the type of injury which courts have found to violate the nuisance statute because the use of a computer system is not the type of property protected by the statute.[29] Based on the foregoing, ADP's motion for summary judgment on the statutory nuisance claim is granted.

E. ADP's Motion for Summary Judgment on Defendants' Claim that it Misappropriated their Wire Communications

■ Boerboom and Farrell also seek recovery from ADP and the other third-party defendants on the theory that ADP and/or IH wrongfully gained access to defendants' computer systems and misappropriated their property. In Count X, Farrell alleges a violation of 18 U.S.C. § 2511, which outlaws the interception and disclosure of wire or oral communications. This statute bars activities such as wiretapping and eavesdropping through the use of electronic surveillance. It does not outlaw the authorized use of computer data and thus has no applicability to the present case because both defendants allowed ADP access to their computer systems pursuant to their contracts with ADP.[30] Steven Farrell and Stephen Boerboom both acknowledged that they were aware that ADP and/or IH could access to their computer systems. Because they allowed such access, they cannot claim that any alleged access was unlawful.[31] Moreover, even if the statute applied to the present case, defendants proffer no evidence that their wire communications were actually intercepted or disclosed. They merely allege that ADP somehow got into their computer systems and used this ac-

---

**29.** Defendants rely on an Iowa case which does not support this claim. In *Page County Appliance Center, Inc. v. Honeywell, Inc.,* the court found that a computer that generated sufficient radiation to disturb a neighbor's television reception constituted a nuisance. 347 N.W.2d 171, 175 (Iowa 1984). The court reasoned that the disturbance of television reception was an interference in the use of the neighbor's land. Defendants, however, are unable to tie their computer deactivation claims to any land and this case does not support their nuisance claim.

**30.** By its terms, 18 U.S.C. § 2511(2)(c) states that "[i]t shall not be unlawful under this chap-

ter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior to consent to such interception."

**31.** In Count VII, defendants seek treble damages pursuant to Minn.Stat. § 626A.13 for the alleged violation of Minn.Stat. §§ 626A.01–.23. The defendants specifically allege a violation of Minn. Stat. § 626A.02 which mirrors 18 U.S.C. § 2511. The Minnesota statute also does not apply to any interception of communication if such access is authorized.

cess to snoop for unspecified purposes. The only evidence to support this allegation is that the indicator lights on the computer systems would sometimes be illuminated.

■ The defendants also seek relief for an alleged violation of 18 U.S.C. §§ 2701–10. This statute, the Electronic Communications Privacy Act, bars unlawful access to stored communications. The statute, however, is not directed to the type of harm alleged by the defendants. As noted above, the defendants consented to ADP's access and cannot now claim that such access was unauthorized. *See* 18 U.S.C. § 2701(c) (prohibition against unlawful access does not apply to conduct authorized "by the person or entity providing a wire or electronic communication service"). Based on the foregoing, ADP's motion for summary judgment on defendants' claims concerning the misappropriation of their wire communication is granted.

## IV. *IH's Motion for Summary Judgment*

IH also moves for summary judgment on all of the defendants' claims. Many of the facts and law offered in support of IH's motion parallel ADP's and ACTL's motions as discussed above. The claims will be reexamined briefly concerning only those facts or arguments that pertain solely to IH's motion.

### A. IH's Motion for Summary Judgment on Defendants' Contract Claims

■ IH is named as a party in Count II of the counterclaims in which defendants contend that the alleged performance problems with the ADP system constitute a breach of contract. However, IH is not a party to the contracts between ADP and Boerboom and Farrell and there was no buyer-seller relationship between IH and the defendants which would give rise to any contractual liability. *See, e.g., Avery*

*v. Solargizer Int'l, Inc.*, 427 N.W.2d 675, 684 (Minn.Ct.App.1988) (holding that there can be no contractual liability where no contractual relationship exists). These claims are governed exclusively by the Uniform Commercial Code because any damages incurred as a result of the nonperformance of the ADP system are economic losses in a commercial setting. The Uniform Commercial Code permits recovery in such cases only where there is contractual privity. *See, e.g., Hapka v. Paquin Farms*, 458 N.W.2d 683 (Minn.1990). Accordingly, IH's motion for summary judgment on defendants' counterclaim in Count II is granted.[32]

### B. IH's Motion for Summary Judgment on Defendants' Fraud Claims

■ The defendants allege the same facts to support their fraud claim against IH as they allege against ADP. The defendants first contend that IH fraudulently failed to disclose its royalty payments and that IH had a duty to disclose the payments because a fiduciary relationship existed between IH and the defendants as its dealers. As discussed above, no fiduciary relationship exists between IH and the defendants. *See, e.g., Groseth Int'l, Inc. v. Tenneco, Inc.*, 410 N.W.2d 159, 168–69 (S.D.1987) (holding that no fiduciary relationship existed between IH and one of its dealers). Moreover, there are no facts to support the defendants' claim that a fiduciary relationship existed or that the parties intended such a relationship. The facts demonstrate that the parties only dealt at arm's length. *See Minnesota Timber Producers v. American Mut. Ins. Co.*, 766 F.2d 1261, 1267–68 (8th Cir.1985). The defendants' mere assertion that they trusted IH is insufficient to establish a fiduciary relationship. *Id.* at 1268 (applying Minnesota law). Thus, this contention will not support defendants' claim of fraud.[33]

---

**32.** Count I, which also alleges breach of warranty claims, is not brought against IH.

**33.** IH contends that the undisputed evidence shows that the royalty payments were actually disclosed. IH relies on Gordon Gibbs' testimony to support this disclosure. Gibbs testified that the royalties were discussed in detail with the dealers at a national IH dealer council meeting in February 1984, which was attended by a group of dealers elected to represent other dealers across the country. Those elected dealers met once a year and then reported the proceedings to the dealers that they represented.

Defendants also allege that various statements were fraudulently made about the ADP systems. IH seeks summary judgment on all fraud claims relating to such statements.[34] As previously discussed, the defendants' claims for fraudulent misrepresentation fail because they either provide no evidence of falsity or the statements alleged concern future acts, opinion or ordinary sales puffing and thus are not actionable. IH also did not have a fiduciary relationship with the defendants, and thus it had no duty to disclose the royalty payments. Therefore, IH's motion for summary judgment on defendants' fraud claims is granted.

### C. IH's Motion for Summary Judgment on Defendants' Civil Conspiracy Claims

Because the defendants proffer no evidence to support their claims that IH conspired with either ADP or Case, or that IH committed any unlawful activity, IH's motion for summary judgment on the defendants' civil conspiracy claims in Count III of the counterclaims is granted.

### D. IH's Motion for Summary Judgment on Defendants' Antitrust Claims

IH's motion for summary judgment on the defendants' antitrust claims is also granted. As previously discussed, the defendants present no evidence that IH forced them to purchase an ADP system. Boerboom and Farrell have both admitted that they knew they were free to purchase computer systems from vendors other than ADP. Although IH admits that it encouraged its dealers to use ADP, there was no requirement that defendants purchase an ADP system. Thus, defendants' antitrust tying claims under state and federal law fail.

### E. IH's Motion for Summary Judgment on Defendants' RICO Claim

All of the defendants' racketeering allegations fail because none of them are premised on the requisite racketeering activity as defined by 18 U.S.C. § 1961(1). *See supra* RICO discussion. Thus, IH's motion for summary judgment on the RICO claims is granted.

### F. IH's Motion for Summary Judgment on the Software Deactivation Claims

The defendants' various claims concerning deactivation are based on their contention that IH was somehow involved in the deactivation of their ADP systems. Such claims fail because defendants proffer no evidence that IH participated in the termination of their computer services. The terminations occurred after the sale of IH farm equipment business to Case in 1985 and IH had no computer contact with the defendants after the sale.[35]

The defendants also claim that IH violated Minn.Stat. § 609.52, which imposes criminal liability for theft, because IH acted with knowledge and consent or participation in the deactivation. As noted previously, however, no civil recovery is available under § 609.52 because the statute permitting civil recovery pursuant to § 609.52 was not effective until after the alleged deactivations occurred and the statute should not be applied retroactively.

Farrell also contends that when it stopped its lease payments, ADP, with the knowledge and consent or participation of IH, threatened Farrell in violation of 18

---

**34.** IH also argues that it is entitled to summary judgment because the defendants failed to plead fraud with the required particularity. Fed.R. Civ.P. 9(b). IH contends that the defendants failed to apprise it of the precise nature and content of the alleged fraudulent misrepresentations, who made the alleged misrepresentations and to whom were they made. In situations where fraud is alleged against more than one party each party "is entitled to know the particular allegations of fraud it allegedly committed. Common circumstances do not excuse a plaintiff from identifying which party allegedly

perpetrated which specific acts of fraud." *Daher v. G.D. Searle & Co.*, 695 F.Supp. 436, 439–40 (D.Minn.1988) (citations omitted). Because defendants plead no statements of actionable fraud, the court need not address the defendants' claimed failure to plead fraud properly.

**35.** As noted previously, Boerboom's software was terminated at Boerboom's request and Farrell's software was not deactivated until July 8, 1987.

U.S.C. § 1951. Section 1951, however, provides no cause of action because ADP had a clear legal right to suspend Farrell's use of its software once Farrell discontinued payment. *See* Deactivation discussion *supra.* Moreover, § 1951 is purely criminal in nature and does not give rise to a cause of action for civil liability. *See, e.g., Peterson v. Philadelphia Stock Exch.,* 717 F.Supp. 332, 335–36 (E.D.Pa.1989) (concluding that § 1951 does not permit a private right of action); *Creech v. Federal Land Bank,* 647 F.Supp. 1097, 1099 (D.Colo.1986) (holding that "no implied private cause of action exists under 18 U.S.C. § 1951"). Thus, the defendants' civil claim pursuant to § 1951 is without merit and IH's motion for summary judgment on this claim is granted.

The defendants further claim that ADP, with the knowledge and consent or participation of IH, willfully disclosed or attempted to disclose to other persons the contents of the defendants' wire communications and/or willfully used or endeavored to use the contents of those communications in violation of Minn.Stat. § 626A.02 and 18 U.S.C. § 2511. As previously noted, those statutes do not apply to the authorized use of computer data, and IH's motion for summary judgment on these claims is granted.

IH's motion for summary judgment on the defendants' trespass claim is also granted. Deactivation of a computer system is not the type of harm that Minn.Stat. § 548.05 was designed to remedy because it precludes only trespass of property that is produced or grown on land. *See Mondt,* 293 N.W.2d at 377. Because the defendants allege no property within the scope of the statute, IH's motion for summary judgment on the trespass claim is granted.

■ IH's motion for summary judgment on the nuisance claim is also granted because Minn.Stat. § 561.01 specifically requires that the alleged nuisance be offensive "to the senses." The defendants present no evidence showing that their software deactivation offended the senses. Moreover, as noted previously, the cases interpreting the nuisance statute do not

stretch the definition of property to include the use of leased software. *See, e.g., Highview North Apts. v. Ramsey County,* 323 N.W.2d 65 (Minn.1982) (holding that ground water is a nuisance covered by the statute because it interfered with plaintiff's free use of its land). Thus, IH's motion for summary judgment on the nuisance claim is granted.

Based on the foregoing analysis, IH's motion for summary judgment on all of defendants' claims is granted.

## V. *Case's Motion for Summary Judgment on the Defendants' Claims*

### A. Case's Motion for Summary Judgment on Defendants' Fraud Claims

■ The defendants allege many of the same factual bases for their fraud claims against Case. First, they assert that Case engaged in fraudulent concealment because it had a fiduciary duty to disclose the royalty payment arrangement between Case and ADP and Case failed to do so. However, Case did not owe the defendants a fiduciary duty. *See, e.g., RMJ Sales & Mktg., Inc. v. Banfi Prods. Corp.,* 546 F.Supp. 1368, 1377–78 (D.Minn.1982). Thus, Case was under no obligation to disclose the royalty provisions to the defendants and this assertion will not support a fraud claim.

Case is also entitled to summary judgment on the defendants' fraud claims based on alleged misrepresentations. Boerboom presents no evidence that Case made any representations, either true or false, to Boerboom. It is undisputed that Boerboom had already leased and installed its ADP computer system several months before it became a Case dealer. Moreover, Steve Boerboom testified that Boerboom had no evidence to prove any involvement by Case in the dealings between ADP and Boerboom prior to February 1985. Thus, Case is entitled to summary judgment on any misrepresentation claims by Boerboom.

In his deposition, Steven Farrell alleged only two misrepresentations which Farrell could attribute to Case: (1) that if Farrell leased an ADP system it would not have to

**1498**

pay for future enhancements during the life of a lease; and (2) that by endorsing the ADP system "Case told us this was a good system."

Examining the future enhancement claim, Steve Farrell conceded in his deposition that no one from Case had ever told him that Farrell would not have to pay for any future enhancements to Farrell's computer. Farrell recalled only that Mark Prokosch, an ADP employee, advised him that future communications would be guaranteed at no additional charge. Despite this concession, Steve Farrell believes that Case impliedly made such a representation, pointing to a letter of Case's dated February 7, 1985, which included a statement that the endorsed suppliers (ADP and DIS) were obligated by contract with Case to meet Case's communication requirements, including both current and future requirements. The letter, however, does not state that a dealer would not have to pay for any future enhancements; the letter merely indicates that future enhancements would be required. Thus, Farrell proffers no evidence that Case made any misrepresentations about the cost of future enhancements and this allegation does not support a claim of fraud.

 Farrell further claims that by endorsing ADP, Case misrepresented that the ADP system was a good one. Farrell again points to the letter dated January 7, 1985, in which Case stated that its endorsement of ADP and DIS meant that the systems were "judged" by Case "to be effective for equipment dealer use" and that ADP and DIS were "judged" by Case "to be experienced, proven performers in the dealer's system market." As discussed previously, however, statements are not actionable as fraud unless they are misrepresentations of a "past or present fact." *Clements Auto Co. v. Service Bureau Corp.*, 444 F.2d 169, 175 (8th Cir.1971) (citation omitted). Statements of opinion and promises of future performance are not actionable. *Mutsch v. Rigi*, 430 N.W.2d 201, 204 (Minn.Ct.App.1988) (addressing

statements of opinion); *Iten Leasing Co. v. Burroughs Corp.*, 684 F.2d 573, 575 (8th Cir.1982) (applying Minnesota law to promises of future performance). On the present facts, Case merely expressed its opinion that both ADP's and DIS's systems would be effective for equipment dealer use and that ADP and DIS were experienced in that market. At most, Case simply expressed a belief that ADP's system would perform properly in the future, and thus the proffered statements do not constitute actionable fraud.[36] Based on the foregoing, Cases's motion for summary judgment on the defendants' claims of fraud is granted.

B. Case's Motion for Summary Judgment on the Breach of Contract Claims

In Count II, the defendants bring breach of contract claims against Case. However, the depositions of Boerboom and Farrell establish that Case has not breached any contract with the defendants. It is undisputed that Case is not a party to the contracts at issue. Stephen Boerboom's testimony indicates that he did not think that Case breached any kind of contractual arrangement with Boerboom. Steve Farrell also testified that he did not believe that Case was a party to any of the contracts at issue. Thus, Case's motion for summary judgment on the contract claims in Count II is granted.

C. Case's Motion for Summary Judgment on Defendants' Civil Conspiracy Claims

In Count III the defendants contend that Case was part of a continuing criminal and civil conspiracy, the alleged goal of which was to force the defendants to purchase or lease ADP computers. Case, however, did not require the defendants to purchase ADP computer systems. Case initially endorsed two dealers (ADP and DIS) and it later approved computer systems offered by three additional manufacturers. It is undisputed that Boerboom purchased an

---

**36.** Case also contends that the defendants failed to allege fraud with particularity, but this argument need not be addressed based on the foregoing analysis.

ADP system before it became a Case dealer. Steve Farrell also testified that no one from Case ever told him that Farrell had to buy an ADP system. Moreover, as noted above, the defendants failed to present evidence that Case combined with the other third-party defendants to accomplish either an unlawful purpose or a lawful purpose by unlawful means. *Harding v. Ohio Casualty Ins. Co.*, 230 Minn. 327, 337, 41 N.W.2d 818, 824 (1950) (citation omitted). Thus, Case is entitled to summary judgment on the defendants' civil conspiracy claim.

### D. Case's Motion for Summary Judgment on Defendants' Antitrust Claims

The defendants' antitrust claims against Case also fail. Case did not require its dealers to purchase an ADP system because it is undisputed that Case, from the beginning, endorsed both ADP and DIS as vendors. Moreover, Case did not require its dealers to purchase computer systems until the end of 1986. Boerboom acquired its ADP system before Case purchased the agricultural equipment business from IH. Steve Farrell also admitted that he knew that his company could have purchased either an ADP system, a DIS system or a system manufactured by any of the other three vendors recommended by Case. Thus, the defendants proffer no evidence that Case forced them to purchase an ADP system and Case's motion for summary judgment on the antitrust claim is granted.

### E. Case's Motion for Summary Judgment on the RICO Claims

As discussed above, defendants present no evidence of racketeering activity within the provisions of RICO. Moreover, the defendants' argument in support of its RICO claim is principally grounded on their characterization of computer royalty payments as kickbacks. This argument is irrelevant as it applies to Case because it is undisputed that Case received no royalty payments from either Farrell's or Boerboom's lease of an ADP system. Thus, Case's motion for summary judgment on the defendants' RICO claims is granted.

### F. Case's Motion for Summary Judgment on Defendants' Claims of Computer Theft or Damage

The defendants' claims pursuant to Minn. Stat. § 332.51 in Count VI fail because the statute was not enacted until after the alleged violations occurred and there is no reason to apply the statute retroactively. *See* Minn.Stat. § 645.21; *Hunt v. Nevada State Bank*, 285 Minn. 77, 92, 172 N.W.2d 292, 302 (1969). Thus, Case's motion for summary judgment on these claims is granted.

### G. Case's Motion for Summary Judgment on Defendants' Claim of Misappropriation of Their Wire Communications

The defendants contend in Count VII of their counterclaims that Case violated Minn.Stat. § 626A.01 *et seq.* because of the alleged misappropriation of information contained in their ADP systems. The defendants, however, proffer no evidence that Case "snooped" in their systems, and thus Case's motion for summary judgment on this claim is granted.

### H. Case's Motion for Summary Judgment on Defendants' Trespass Claim

Case is entitled to summary judgment on the trespass claim because, as previously noted, computerized data does not fall within the scope of Minn.Stat. § 548.05. Moreover, even if computerized data could constitute property under the statute, neither Farrell nor Boerboom allege any facts to demonstrate that Case was responsible for the alleged computer deactivation. Its motion for summary judgment on this counterclaim is therefore granted.

### I. Case's Motion for Summary Judgment on the Statutory Nuisance Claims

The statutory nuisance claim advanced by the defendants again relates to the alleged deactivation of the computer systems. The defendants, however, concede that Case was not responsible for that

deactivation. Moreover, even if the defendants claimed that Case was responsible, the alleged deactivation is not the type of harm protected by the nuisance statute. *Randall v. Village of Excelsior*, 258 Minn. 81, 84–86, 103 N.W.2d 131, 134–35 (1960) (holding that nuisance should not be extended to cover claims more properly defined by other legal theories).

J. Case's Motion for Summary Judgment on Defendants' Claims of Interception and Disclosure of Wire or Oral Communications

The defendants assert in Count X that Case violated 18 U.S.C. § 2511 by intercepting or attempting to intercept their wire communications. The facts, however, do not support this claim against Case. Steve Farrell testified that he really did not think that Case intercepted any of Farrell's communications. Similarly, Steve Boerboom indicated that he would say no when asked if Boerboom was contending that Case engaged in some kind of wiretapping of Boerboom's facilities. Moreover, as previously indicated, § 2511 does not apply to the authorized use of computer data and Case's motion for summary judgment on this claim is granted.

K. Case's Motion for Summary Judgment on Defendants' Claim Regarding Unlawful Access to Electronic Communications

The defendants also seek relief for an alleged violation of 18 U.S.C. § 2701, claiming that Case violated this statute by accessing their computer systems without authorization. The statute, however, bars only unlawful access to stored communications. Boerboom and Farrell consented to access by ADP, and further concede that they have no such claim against Case. Therefore, Case's motion for summary judgment on this claim is granted.

### CONCLUSION

Based on the foregoing, the only claims that remain in this action are Boerboom and Farrell's claims for breach of contract and express warranty against ADP. Their damages pursuant to those claims, however, are limited to the recovery of direct damages. Summary judgment is granted on all other claims. Thus, IT IS HEREBY ORDERED that:

1. ACTL's motion for summary judgment for the relief requested in its complaint against Jack Farrell Implement Co. and Boerboom International, Inc. is granted in favor of ACTL. Judgment is entered against Boerboom International, Inc. for $20,855.42. Judgment is entered against Jack Farrell Implement Co. for $33,020.46;

2. ACTL's motion for summary judgment on defendants' answers and counterclaims III–XI is granted in favor of ACTL;

3. ADP's motion for summary judgment on all of defendants' answers and counterclaims is granted in ADP's favor except to the extent that the defendants seek relief for breach of contract and express warranty;

4. Navistar International Transportation Corp.'s (IH) motion for summary judgment is granted in favor of IH on all of defendants' claims against IH Navistar International;

5. J.I. Case Co.'s motion for summary judgment is granted in favor of Case on all of defendants' claims against Case; and

6. Defendants' motion to stay the entry of ACTL's judgments against them is denied.